8 145
61 138

---

## Banks *against* Judah and others.

It is an established principle in equity, that an agent or trustee shall not be both seller and buyer of the same property.

Therefore, where a corporation for manufacturing purposes, of which *R.* was a member, voted to sell its property, consisting of real estate and machinery; and such property was purchased by *R.*, not for himself, but for such members of the corporation as should, within a short time, pay their proportion of the debts of the corporation and the purchase money; and a large majority of such members, forming a new association, assumed the debts of the corporation, and paid the purchase

money; it was held, on a bill in chancery, that as a majority of the members of the corporation, acting as agents for all, were in fact, both sellers and buyers, the sale was void.

The delay of a party, apprized of his right, and of its infringement, to assert it, for a period sufficient to bar an action at law founded on the same right, will preclude him from relief in equity; especially, if by such delay, he has avoided a risk, which, otherwise, he must have shared with the adverse party.

Therefore, where a corporation for manufacturing purposes, being greatly embarrassed, in 1818, voted to sell, and in fact sold, its property, to relieve itself from such embarrassment, but the sale, though without actual fraud, was so made as not to be valid; the plaintiff, a stockholder of the corporation, apprized of what had taken place, and informed, that he might be admitted into a new association, embracing most of the members of the corporation, and possessing its property under such sale, upon the same terms as they had been; after this, the plaintiff made no claim until 1826, and brought no suit until 1828, when he sought relief, by a bill in chancery; it was held, that he had outstaid his time; and the bill was dismissed, but without costs.

THIS was a bill in chancery, stating the following case.

In *January,* 1814, certain persons associated for the purpose of establishing a woolen and cotton manufactory in *Norwalk,* and entered into written articles for that purpose. In the months of *January, February* and *March* of that year, the sum of 42,500 dollars was subscribed, by about twenty persons; and in *February* 1815, further subscriptions were added, to the amount of 5,500 dollars. In *October* 1814, *Ebenezer Jessup* and others procured an act of the General Assembly of this state, constituting them and their associates a corporation, by the name of *The Saugatuck Manufacturing Company,* for the purpose of manufacturing cloths and other fabrics of wool and of cotton, with the usual powers of such an institution.

By the first section of the act, the corporation was empowered " to purchase, take, hold, occupy possess and enjoy any such lands, tenements or hereditaments in the county of *Fairfield,* as shall be necessary for the views and purposes of said corporation, not exceeding in the whole 200 acres of land, (unless the same be taken in payment of or security for debts of the corporation) and the same to sell or dispose of at pleasure, or to take a lease or leases thereof for a term of years."

By another section it was provided, "that the stock, property and affairs of the corporation shall be managed by five directors, one of whom they shall appoint their president, who shall hold their offices for one year." " A majority of the directors,

on all occasions, shall constitute a board for the transaction of
business ; and a majority of the stockholders present at any
legal meeting, shall be capable of transacting the business of
such meeting, each share entitling the owner thereof to one
vote." By another section, the president and directors were
empowered " to make and establish such by-laws, rules and
regulations as they shall think expedient for the better manage-
ment of the concerns, officers, &c. of the said corporation, and
the same to alter and repeal."

This act was accepted, by the members of said association ;
and they became stockholders under it. The plaintiff subscri-
bed and paid 2,000 dollars. The company proceeded in a
course of profitable business. The plaintiff removed to *Louis-
ville*, in *Kentucky*, a thousand miles distant ; and since 1816, has
had little communication with the company, or its concerns.
On his return to this state, in the summer of 1828, he found his
right to any portion of his investment, either capital or pro-
duct, utterly denied, although the concern had been very suc-
cessful, having sustained no losses, and having, for many years
past, made an annual dividend of seven *per cent.* upon the
whole capital ; and measures had been adopted, by which his
name had no longer a place among the stockholders, and his
whole investment, as well as all the profit arising on it, had been
appropriated to other members of the concern.

The amount subscribed and paid, *viz.* 48,000 dollars, was in-
vested in real and personal estate for the use of the corpora-
tion ; a debt was contracted for machinery in *New-York ;* and
a scheme was projected, by the agent of the company, to ex-
clude the plaintiff and others from all benefit in the corpora-
tion. This scheme was to sell the property in form and ap-
pearance only ; that the agent should buy it for himself and
those who associated with him ; that the avails should be dis-
posed of, to pay the debts of the corporation, and the surplus,
if any, be divided among the individual proprietors ; that a
new company should then be formed, so as to prevent other
persons than such as they chose from being members thereof ;
and that said estate should be transferred, by the agent, to this
new company. The first measure was to repeal a by-law,
then existing, requiring ten days notice, by mail or personal ser-
vice, to every stockholder, of the meetings of the company, and
in lieu thereof, directing notice, by advertising in a newspaper
in *Bridgeport*, and one in *New-York*, none of which newspa-

*Fairfield,*
June, 1830.

Banks
*v.*
Judah.

pers circulated at *Louisville.* This was done on the 2nd of *January* 1818; and at the same time, a special meeting of stockholders was called, without stating the business to be done, to meet on the 21st of the same month; at which meeting it was voted, without the knowledge of the plaintiff, that the president and directors should have power to dispose of all the property of the corporation, at auction or otherwise. This meeting was adjourned until the 21st of *February* 1818, when the directors declined to act; and a vote was passed, authorizing *Seymour Taylor* to sell and dispose of all said property, at auction or otherwise, at the highest price that could be had; requiring him to demand 5,000 dollars in cash, and notes for the balance; and to sell in such manner, that the purchaser should indemnify the company against said debt for machinery, and give a bond for that purpose, being fully informed of the nature of the claim; and directing, that the avails should be paid over to the president and directors, for the corporation, and applied to the payment of the debts due. On the 18th of *March* 1818, a vote was passed, allowing a sale, though the sum offered should not amount to 5,000 dollars. The provision as to the bond was fraudulent and delusive. Notice was immediately given of the intended sale; and soon afterwards, it was made; and *Lewis Raymond*, secretary of the company, became the purchaser in form, but not in reality, and held the property in trust for fraudulent purposes in relation to the plaintiff and others.

After the sale, the corporation, by *Lewis Raymond*, delivered a certificate to the town-clerk of *Norwalk*, certifying that the stock paid in amounted to 42,676 dollars; and on the same day, those members of the company who had thus combined, formed a new company, by the name of *The Saugatuck Manufacturing Association*, with a view of being incorporated, and to receive back said property of *Raymond*. One of the articles of this association was as follows: " The several stockholders of the *Saugatuck Manufacturing Company*, who shall subscribe hereto, and pay their respective proportions of the amount of said purchase made by *Lewis Raymond*, shall be stockholders herein according to the stock held by them in the said company, and the sum so by them severally paid: Provided they, or any of them, shall subscribe to these presents, and pay their proportion of such purchase money, at such time and in such manner as may be required of them, by the directors

herein-after named ; and in default of such payment, the inter- *Fairfield,*
est of each and every defaulter to be forfeited to this associa- June, 1830.
tion."

By another article, it was provided, that " any person, who
was a stockholder in the *Saugatuck Manufacturing Company,*
who shall not subscribe to this association within twenty days
from the date hereof, shall be thereafter deprived of the privi-
lege ; and it shall not be lawful for the directors herein named
to admit the subscription of any such stockholder after the said
term of twenty days has expired."

The members of this association soon afterwards held a
meeting, in which they voted an instalment of fifteen *per cent.*
The shares subscribed to this company were the same shares
and to the same amount, as were owned by these individuals in
the former corporation. The plaintiff being a stockholder in
the *Saugatuck Manufacturing Company,* upon his return, in
*June* 1828, claimed to be admitted a member of the new asso-
ciation ; which claim that body utterly refused to allow.

In *May* 1819, the members of the new association obtained
an act of incorporation, by the name of *The Richmondville
Manufacturing Company,* with the usual powers. The per-
sons named in the charter are the same persons as those who
were subscribers to the association, except *Samuel Kellogg,*
who has become a member of the incorporated company ; and
the same persons are entitled to the same amount of stock in
the last corporation as in the first. The first charter is still in
force, unless it is dissolved, by the preceding facts ; of all which
the plaintiff was ignorant until his return from *Kentucky.*

In pursuance of said combination, *Raymond,* on the 25th of
*May* 1818, received from *Taylor* a deed of said land and man-
ufactory, with all the estate of the company, for the sum of
4,300 dollars, although *Raymond* never paid one cent for such
property, and it was worth more than 45,000 dollars. He
made no stipulations for said claim for the machinery ; but it
was held out to deter others from bidding. In pursuance of
the same combination, he, on the 21st of *November* 1820, re-
leased the same property to the *Richmondville Manufacturing
Company,* which was all the property owned by that corpora-
tion.

The bill prayed, that the plaintiff might be admitted as a
stockholder, or be paid for his stock. There was also the usual
general prayer. The bill was brought in *August,* 1828.

Banks
*v.*
Judah.

*Fairfield,*
June, 1830.

Banks
*v*
Judah.

The defendants, in their answer, denied all fraud and combination, and charged the plaintiff with knowledge ; and insisted upon the lapse of time as a defence. They also filed a cross-bill for a disclosure from the plaintiff. A disclosure was made, and a full hearing had before the superior court. The finding of that court embraced the following facts.

The original association, in 1814, the act of incorporation, the acceptance of it, and the business under it, and the interest of the plaintiff, were all as stated in the bill. Soon afterwards, the plaintiff, being a clergyman, removed to *Kentucky*, and remained there about twelve years, and was thus deprived of those facilities for information, which, otherwise, he would have had. Upon his return, the defendants denied his interest in the company, in consequence of the proceedings during his absence. The capital stock of the company was 48,000 dollars, mostly paid in, and invested in real estate and machinery. The machinery proved to be of inferior quality ; and after paying the *New-York Machine Company* a large sum for it, the company declined paying any more, and left an outstanding claim of about 4,000 dollars unprovided for. From the year 1815 to the year 1818, the business of the company was very unprofitable, so that they had become embarrassed and much pressed for debt, and their stock was greatly depressed in value, their property was attached, and they had no means to relieve themselves but by voluntary payment of the stockholders, or by suffering the company property to be taken on execution.

On the 26th of *December*, 1817, a vote was passed to sell the whole establishment. On the 21st of *January* 1818, a vote was passed changing the mode of warning the meetings of the company ; and on the same day, a vote authorizing the president and directors to sell the company property at auction, was passed ; and the notice did not set forth the object of the meeting. At an adjourned meeting, on the 21st of *February* 1818, the directors having declined acting, *Seymour Taylor* was authorized to sell, as stated in the bill ; and on the 18th of *March* following, the vote as to the sum and terms of payment, as stated in the bill, was passed. They adjourned from time to time until the 1st of *April* then next ; after which they met no more.

*Taylor* gave notice of the intended sale in a *Bridgeport* and in a *New-York* paper ; and on the 18th of *March*, many of the inhabitants of the village being present, after stating the terms

of the sale, and the claim of the *New-York Machine Company*, he sold the property to *Lewis Raymond*, secretary of the company, who was the highest bidder, for 4,000 dollars. He purchased the property for the benefit of the *Saugatuck Manufacturing Company*, or such of them as should, within a short time thereafter, pay their proportion of the debts of the company and of the purchase money; but he paid *Taylor* no money, except for his services, and gave no bond to pay the debts. The *Saugatuck Manufacturing Company*, however, went on and paid the debts due from the corporation to a greater amount than the sum bid for the property sold. The claim for machinery still remains uncancelled, and no further demand has been made for it. On the 16th of *June* 1818, most of the stockholders of the *Saugatuck Manufacturing Company* entered into a new company, called the *Saugatuck Manufacturing Association*, as stated in the bill. The object of this association, the names of the associates, and the sums to be paid by them respectively, were also such as are stated in the bill; and most of the subscribers were stockholders in the incorporated company to the same amount as their subscriptions. On the 27th *January* 1818, they lodged the certificate of stock with the town-clerk of *Norwalk*, as stated in the bill. In *May* 1819, the act of incorporation, as stated, was obtained. On the 18th of *June* 1818, *Raymond* received from *Taylor* a deed of all the real estate of the *Saugatuck Manufacturing Company*, as stated in the bill, which was worth more than 4,300 dollars, but much less than its original cost. There was no actual fraud in the sale, and no design to exclude the stockholders, who should contribute their fair proportion for debts and purchase money, nor any fraud, unless it may be inferred from the facts found in the case. Most of the stockholders resided in the vicinity or in the city of *New-York*; and the plaintiff had friends in the vicinity, from whom it might be expected he would receive information. When he left *Connecticut*, his information as to the affairs of the company was limited; but he had no reason to suppose them prosperous, and was anxious to dispose of his interest therein. On the 28th of *January* 1818, *E. Swift*, Esq., by request of the directors of the company, gave him, by letter, a particular account of its situation, its embarrassments, and of the votes to sell, and the agreement of most of the stockholders to become purchasers; which letter was received on the 20th of *February*. In his answer, he regretted that he had not known

*Fairfield,*
June, 1830.

Banks
*v.*
Judah.

of the proceedings concerning the manufactory in time, requesting, if the sale was not made, and Mr. *Swift* had sufficient of his funds, that he would purchase, and if more funds should be necessary, he would remit them. This letter from the plaintiff was not received until thirty-five days after its date, nor until the sale had been made. On the 30th of *March*, Mr. *Swift* replied, that the sale had been made on the 18th, for 4,300 dollars, not more than enough to pay the debts of the company; that most of the proprietors had united in the purchase, probably all that were able; that he would be permitted to join on the same terms as others had been, *viz.* twenty *per cent.* instalment on his stock, and his proportion of the purchase money; that the stock, however, was worth nothing; that the purchasers intended to keep the establishment in operation;— calling upon him to write, if he concluded to purchase. On the 14th of *May* following, the plaintiff wrote to Mr. *Swift*, returning his thanks to the directors for the offer to redeem at the purchase price, remarking, that he had written to *T. Wakeman*, as his agent to act for him, and expressing a wish to redeem the stock, if it was worth it. He should, he added, have asked him (Mr. *Swift*) to do it, if the plaintiff's funds in his hands had been sufficient. On the 4th of *June*, the plaintiff writes, that he expects *Wakeman* has done something towards paying the necessary sum. On the 16th of *June*, *Wakeman* wrote to the plaintiff, giving a particular account of the state and value of the property, and expressed his doubts, in which another friend concurred, whether it would be expedient for him to redeem, or come into the concern; stating also a vote of the directors of *June* 1818, that unless payment should be made in twenty days from the 13th of that month, the stock should be forfeited; but he had no doubt that the plaintiff might now be admitted. In 1825, the plaintiff appointed *James Hughes* his attorney in *New-York*, at whose instance *Israel Munson* was appointed to sell the shares of the plaintiff, or pay a certain sum; but as he could not ascertain that the shares were worth any thing, and could not sell, he did nothing. So it rested until 1826.

For nine years preceding *September* 1828, the plaintiff was in feeble health, confined, for months together, in his house, the most of the time unable to attend to his domestic concerns or his professional duties, and often brought near the grave. Since 1826, his claim for readmission into the company has

been steadily pursued ; and in *May* 1828, several of the stock-holders consented, that he should be readmitted into the company, on the same terms as the others, if a majority of the directors would consent.

From *March* 1823 to *March* 1829, the *Richmondville Manufacturing Company* divided, annually, from six to seven *per cent.* upon their capital stock.

*Samuel Kellogg* and *William Baraclough* became members of the association formed on the 16th of *June*, 1818. *Samuel St. John* and *Samuel Jarvis* & Co. purchased in, and are now stockholders in the company last formed, who did not belong to the former company, or association ; and neither they nor *Baraclough* are parties to the suit.

The case was reserved for the consideration of this Court, and the following questions were submitted. 1. Are all the proper parties before the court ? 2. Had the plaintiff ever a right to claim the interposition of a court of chancery ? 3. Is that right affected, in any manner, by the lapse of time ? 4. What is the nature and extent of the relief to be granted, if any ; or what decree ought to be made ?

*N. Smith* and *Sherman*, for the plaintiff, contended, 1. That the alienation of the property of the *Saugatuck Manufacturing Company*, attempted, by *Seymour Taylor*, the agent, to *Lewis Raymond*, the secretary, of the corporation, and by the latter, to the new association, was utterly void, on the following grounds.

First, the stockholders had no power to pass a vote disposing of the property of the corporation ; the president and directors being the only persons empowered by the charter to make a transfer. The power of the stockholders is limited to the appointment of the directors ; by whom alone " the stock, property and affairs of the corporation" are to " be managed," and who alone are authorized " to make and establish such by-laws, rules and regulations as they shall think expedient for the better management of the concerns &c. of the corporation." See the charter.

Secondly, if the stockholders had the power, there was not a legal meeting for this purpose, as no notice was given of the business to be transacted. It is repugnant to the fitness of things, that the whole property of the corporation should be disposed of, without an intimation to the stockholders, previous

*Fairfield,*
June, 1830.

Banks
*v.*
Judah.

to the meeting, that such a proposition was to be acted on. And the proceeding in question is the more exceptionable, as the meeting at which it was held, was a special, as contradistinguished from a general or annual meeting.    The *adjourned* meetings are obnoxious to the same objection.

Thirdly, the power, if valid, was not pursued.    The conditions of sale were, that a bond of indemnity should be taken against the claim of the *New-York Machine Company*, which was not taken, and that the property should be sold for cash, which was not done.

Fourthly, the vendors were themselves the purchasers of the property.    This is fully evinced by the facts disclosed. Now, it is a well settled rule, especially in chancery, that a man cannot, at the same time, be both vendor and vendee of the same property.    This case is within the spirit, if not within the letter of that rule.    The intervention of the agent, and the secretary, and the new association of the same persons to carry on the same business, makes no difference.    It is attended with all the danger and all the mischief of a direct sale and purchase, by the same individual or corporation.    The rule is not founded on the supposition of actual fraud, but on a principle of policy to guard against abuse.

2. That if the sale was valid, the plaintiff is entitled to come in as a stockholder in the *Richmondville Manufacturing Company*, upon the settlement of an account, upon the same terms as other stockholders.    *Raymond* purchased *in trust* for *all* the old stockholders.

3. That the plaintiff was not precluded from relief, by the lapse of time and the circumstances of the case.    [Here the counsel went into a full examination of the circumstances of the case, and suggested many topics of argument in support of their position, which it is not deemed necessary to specify, especially, as the principal ones are either stated or referred to, in the opinion of the Court.]

*Sherwood* and *Swift*, contra ,contended, 1. That *Taylor* had power to sell the property of the *Saugatuck Manufacturing Company.*    Nothing appears in the finding of the court affecting the validity of the meeting of the company, held on the 26th of *December* 1817, at which the vote of sale was passed.    The meeting held on the 21st of *January* 1818, was unquestionably, a legal meeting, unless it was rendered otherwise, by the

mode of warning ; which was pursuant to a vote passed on the *Fairfield*, 2nd of the same month. The mode at that time prescribed June, 1830. was reasonable, and not repugnant to the charter. The omission to state in the warning the special object of the meeting, did not affect its legality. The charter did not require it ; nor was it necessary at common law. 1 *Kyd on Corp.* 430. If the meeting held on the 21st of *January* was legal, that held on the 21st of *February* following, by adjournment, was, of course, legal ; and the appointment of *Taylor* to sell, at the latter meeting, was also legal. Though the directors are the charter agents of the company, and, when elected, derive their powers from the charter, and not from the stockholders ; yet the charter gives them no power to sell real estate. An agent for this purpose not only *may*, but *must*, be appointed by the company.

Banks
*v.*
Judah.

2. That the stockholders had a right to purchase the property. At common law a corporation may grant to one of its members. 1 *Kyd on Corp.* 180. The stockholders are not agents or trustees for each other. They may buy each other's stock. The corporation, as such, is a trustee for each stockholder, and accountable to each for his share. Although a man cannot buy of himself, yet a *trustee* may buy from his *cestuy que trust ; (Randall* v. *Errington*, 10 *Ves.* 423.) and a *cestuy que trust* from his *trustee*. 1 *Madd. Chan.* 110. In this case, *Raymond*, the purchaser, did not buy for the corporation. He had no power to do this. Even the plaintiff does not claim it in his bill, alleging only, that he bought for himself and certain other stockholders.

3. That the want of a bond did not invalidate the sale. The purchasers never refused to give it ; and the company may be presumed to have waived it. At any rate, if the sale is otherwise good, chancery will not set it aside on this account. The purchasers bought the property *bona fide ;* paid their money for it ; were let into possession ; and have expended large sums in improvements. They would now be entitled to the property in equity, even if no deed had been given, and might compel the company to give one. Besides, as the plaintiff has sustained no injury, by this defect, he cannot avail himself of it to set aside the sale.

4. That if the sale was defective, the plaintiff is not entitled to relief, because he had, at the time, full knowledge of all the circumstances attending it, and said nothing to discourage it.

*Fairfield,*
June, 1830.

Banks
*v.*
Judah.

His letters, indeed, go far to shew an express assent ; but if they fall short of this, they are, in connexion with the lapse of time, conclusive evidence of *acquiescence.* 1 *Madd. Chan.* 98. 99. 113.

5. That the plaintiff's claim is barred by the lapse of time, in analogy to the statute of limitations ; ten years having elapsed from the sale to the commencement of this suit. Equity so far adopts the statute of limitations as to apply it to cases analogous to those to which it is applicable at law. *Stackhouse* v. *Barnston,* 10 *Ves.* 453. 2 *Madd. Chan.* 308. 2 *Swift's Dig.* 109. *Kane* v. *Bloodgood,* 7 *Johns. Chan. Rep.* 90. What action at law, then, could the plaintiff sustain at this time ? No doubt a corporation is liable to its members, for mismanagement of corporate property to the same extent as any other agent or trustee ; and if the plaintiff has sustained any injury, by an illegal act or omission of this company, an action on the case would lie ; or an action of account would lie for the stock and its avails ; both of which are barred in six years.

But if there were no analogous case at law, the lapse of time is an equitable bar. The plaintiff has been guilty of *gross negligence* in not asserting his claim sooner. *Alley* v. *Deschamps,* 13 *Ves.* 225. *Benedict* v. *Lynch,* 1 *Johns. Chan. Rep.* 370. 2 *Swift's Dig.* 89, 90. *Hollingsworth* v. *Fry,* 4 *Dall.* 345. 1 *Madd. Chan.* 417.

WILLIAMS, J. The plaintiff claims, that the proceedings in this case, by the corporation of which he was a member, are fraudulent and void ; and that a court of chancery will aid him in recovering the property which he has lost. That there was no actual fraud in the defendants, is found by the court. Two principal questions then arise : 1. Is the transfer of this property, by the *Saugatuck Manufacturing Company,* valid ? 2. If it is not, will a court of chancery, at this distance of time, and under the circumstances disclosed, lend the plaintiff its aid ? These being answered, it will, in my opinion, become unnecessary to examine some of the questions, submitted by the superior court.

1. Is the transfer valid ? A great number of objections have been made to the proceedings of the company in relation to this sale, some of which I deem entirely groundless ; and some of which are, certainly, very imposing. But if any one is in his favour, that is sufficient ; and as I am of opinion with the

plaintiff upon one of his objections, it is unnecessary particularly to examine the others.

It is a principle of a court of equity, long since established, that an agent or trustee shall not be both buyer and seller. To allow this would open too wide a door for fraud, and place those, who need protection, too much in the power of those, who are assigned to protect them. Accordingly, sales by administrators or guardians to themselves, directly or indirectly, have been held invalid even at law ; and this case, in my opinion, falls within that class of cases.

The *Saugatuck Manufacturing Company,* for causes the propriety of which we need not consider, at a meeting of their stockholders, of whom *Lewis Raymond* was one, in *December* 1817, voted to sell their property ; and, by subsequent votes, directed the mode. The property thus sold was purchased by *Raymond, not for himself,* but for such members of the company as should, within a short time, pay their proportion of the debts and purchase money. If all the former stockholders had done this, as they might, it would have been a purchase, by one individual of a corporation, of the corporate property, not for himself, nor for the corporation, but for the individual members of it. By the act of incorporation, a majority of the stockholders have the power to act for the whole. They become, therefore, agents or trustees for the whole. When they vote as a corporation to sell, and as individuals to buy, they act precisely as when *A.,* an executor, agrees to sell, and *A.,* the individual, becomes the purchaser. Here a majority of the stockholders of the corporation, by their agent *Seymour Taylor,* sell this property, and the same persons, by their agent *Lewis Raymond,* purchase it. They are, then, in fact both sellers and purchasers. And the court must look at the real nature of the transaction, notwithstanding the appearance it is made to assume. Here, *Raymond* pays no money, and gives no bond, because it is expected the same property is to go back to the same hands, in some new shape. And accordingly we find, that the *Saugatuck Manufacturing Association* go on and pay the debts of the company.

I know it is said, that this sale is made in such a manner, that all may come in, who choose to do so. This is certainly important when we are enquiring for actual fraud ; but it cannot relieve the transaction from the objection that it is of a character which may be made use of for fraudulent purposes ;

and therefore, it cannot be tolerated, though there be no actual fraud.    In this respect, it is somewhat analogous to the case of a trustee, who pays a full price for the trust property he purchases.    In such cases, it has been often decided, that this would not validate the sale.    This sale, therefore, cannot be recognized, by this Court, as operative against those members of the corporation, who object to it.

2. The next question to be considered, is, whether this Court, at this time, and under these circumstances, will relieve the plaintiff?

If the course taken by the defendants was such as claimed by the plaintiff; if their object was to cheat him out of his stock ; he certainly would have been entitled to the aid of a court of justice, either at law or in equity.

But what are the facts?    The company went into operation, during the war, "in the full tide of successful experiment." The news of peace, while it imparted happiness to the country at large, threatened ruin to those, who had embarked deeply in domestic manufactures.    This company had another calamity to encounter.    Their machinery proved to be of an inferior quality.    They became embarrassed.    Their creditors pressed for payment.    They had nothing to meet their debts but that machinery and their real estate.    To part with either would prevent future operations.    No provision existed, by which they could tax the stockholders, although after the company property was gone, individual property might be taken for debts of the corporation.    Under circumstances so embarrassing, it is proposed to sell the property ; suffer all the stockholders to come in as purchasers; and by this operation, raise money to pay the debts, and thus be enabled to go on with the business. Accordingly, in *December,* 1817, a vote to sell was passed ; after which sundry other votes, from time to time, were passed, the better to carry that vote into effect.

Soon after the vote to sell,—not before, as would be supposed from the bill,—*viz.* on the 21st of *January* 1818, a vote was passed altering the mode of warning meetings.    The former mode was by personal notice, or ten days notice by mail ; the latter, by notice in a newspaper in *Bridgeport,* and in the city of *New-York.*    From the facts shewn, it is apparent, that most of the then stockholders resided in the city of *New-York,* or in the vicinity of the manufactory.    That being the case, I see no reasonable objection to the notice proposed.    And the plaintiff,

who alone complains of it, living, as he did, a thousand miles distant, would have been no more benefitted by ten days notice by mail, than by two weeks publication in a newspaper printed among his friends in his native county. Besides, this being after the vote to sell, he must have been put upon his guard, if he wished to watch the conduct of this corporation. I think no inference can be derived from this of a fraudulent intent. But when I find, that on the 28th of *January* of that year, his friend Mr. *Swift*, by request of the directors of that corporation, gave him a particular account of its situation, of its embarrassments, and of its votes to sell, and this fifty days before the actual sale, I can see no reason to believe, that the mode of warning meetings was changed with any such views as are imputed to this corporation or its members. The mode adopted was certainly more convenient, more conformable to the practice of similar institutions, and such as men of business would expect. Neither mode, however, could be of much use to a man so remote as the plaintiff, unless he had an agent in the vicinity.

On the 18th of *March*, the sale was made. Then the outstanding debts were fairly stated; notice was given that a bond would be required; a considerable number of persons were collected; and the sale was made to the highest bidder. A bond was not taken, nor the money paid; but those for whose use this purchase was made have paid the debts, and no injury has arisen from the want of the bond. This may be no sufficient answer to the objection, that the bond was a condition precedent; but these facts satisfy me, that no fraud was intended nor practised; and that the plaintiff can no more complain of constructive than of actual fraud. The defendants honestly intended to extricate themselves from a situation in which they could do nothing but by unanimous consent, which they could not expect to obtain, or by some fortunate accident less to be anticipated, or by adopting the course which they did. So far from attempting to gain advantage of the plaintiff, they have shewn an anxiety that he should be placed upon the same ground with themselves. Mr. *Swift*, at their request, informed him, that he should be admitted upon the same terms they were.

It is said, that Mr. *Swift* informed him, that an instalment of twenty *per cent.* was required; that this was an arbitrary requisition, and more than others paid; and more than was re-

quired from them. This twenty *per cent.* was, as I understand, a contemplated additional subscription, which it was supposed might be necessary, but which, of course, would not be required of him, if it was not of others. There is, certainly, nothing to shew, that it was deceptively mentioned, to prevent him from taking his stock.

When the defendants came forward to take the company property, which, at that time, whatever was its nominal value, could be sold for little or nothing, and caused information to be given to the plaintiff, what ought he to have done? Was it right in him to stand by; to watch the result of this experiment; and avoid the loss, if it proved unfortunate, upon the ground that there was a sale, and claim the profits, if profits were made, upon the ground that there was no sale?

It is too much to say, that this may be done at any period, however remote. Here, the plaintiff was informed of the proposed sale, in *January* 1818, and on the 30th of *March*, of the actual sale, and that he would be allowed to come in. On the 14th of *May*, he returns his thanks for the offer; says he wishes to redeem the stock, if it is worth redeeming; and requests Mr. *Wakeman* to act for him. On the 14th of *June*, Mr. *Wakeman* writes to him, and, after giving a particular account of the business, expresses his doubts (in which he says another friend concurs) whether it is best for him to redeem, or come into the concern. From that time until the year 1825, no further step was taken, and then nothing but to appoint some other person to enquire. From *June* 1818, until some time in the year 1826, after the information he had received, the plaintiff never intimated to the defendants, that he was desirous to take any part of the stock, or to have any thing to do with the concern. On the contrary, he seems to have acquiesced in the advice he had received from his friends, and to have determined to risk no more.

When I consider the nature of his profession; the state of his health; his distance from the defendants,—I should be disposed to allow him a much more liberal time, than to a man whose education, and habits, and situation, all led to promptitude and despatch in mercantile affairs. And yet with all that allowance, it seems to me, that seven or eight years is quite too long for him to be permitted, at the sole hazard of those who offered to admit him in the first instance upon equal terms, to wait the result of an experiment, which his friends considered

doubtful, if not hazardous. After the opinion given him, by *Fairfield,* Mr. *Wakeman,* he must have made up his mind to relinquish June, 1830. every idea of taking an interest in this concern, when we do not find, that for seven years after, he made even an enquiry respecting it. Under such circumstances, a court of chancery cannot regard this claim with much complacency.

Banks
*v.*
Judah.

Six years acquiescence would have barred an action on the case for an illegal transfer of the stock, or for any mismanagement of the company concerns. Six years, also, would have barred an action of account. And six years was a sufficient time for the plaintiff to determine whether he would come into this association; and yet eight years elapsed before he requested it; and more than ten before he demanded it by suit. *Kane* v. *Bloodgood,* 7 *Johns. Chan. Rep.* 122.

It is said, that he did not know the facts, by which the claim he now makes could be supported. But these facts were not secrets, locked up in the breasts of the directors of this company. From their very nature, the prominent facts were public; and all of them were capable of being ascertained ten years ago, as well as at the present time. Nor am I satisfied, that he was ignorant of these facts; so far from it, that it is proved, by his own admissions, that he was early apprised of the principal facts regarding this sale, particularly of that fact upon which the sale has been declared invalid by the court. Mr. *Swift* early informed him of the vote of the stockholders to sell; he then informed him of the sale, and that most of the stockholders, indeed all that were able, had united in the purchase, and of the willingness of the directors to suffer him to come in with the purchasers. He cannot now say, that he had not the information.

He might then have done, with the consent of the purchasers, what he now asks this Court to permit him to do against their consent. But if he then had done it, he must have run the same hazards that they did, and incurred the same losses. This he virtually declined. Now, after waiting for ten years, he asks a court of equity to assist him in reaping the profits of an adventure, in the risks of which he was unwilling to share. This ought not to be allowed. "Equity," (says Judge *Paterson*) "will not suffer a party to lie by till the event of the experiment shall enable him to make his selection with certainty of profit one way, and without loss any way. This mode of procedure is unfair; contrary to nat-

*Fairfield,*
June, 1830.

Banks
*v.*
Judah.

ural justice; and in exclusion of mutuality." *Hollingsworth* v. *Fry,* 4 *Dall.* 347, 8.    That was a case where the party had contracted to pay for certain lands, the value of the defendant's improvements, as estimated by certain arbitrators, within six months, and made no tender till the lapse of five years.    So where there has been great delay on the part of a vendor, and application is made to a court of chancery *by him;* his conduct is considered as evidence that he has abandoned the contract. *Lloyd* & al. v. *Collett,* 4 *Bro. Ch. Rep.* 469.

How far this delay will affect the legal right of the plaintiff, it is not necessary for me to enquire; nor is it necessary to decide, whether he originally required aid in a court of chancery. Sufficient is it to say, that situated as the plaintiff in this case is, after so long a delay, I think if he has a remedy, he ought to seek it in a court of law, and not in a court of equity.    I do not think, however, that costs should be taxed against him; and I would, therefore, advise, that the bill be dismissed without costs.

HOSMER, Ch. J. and PETERS and DAGGETT, Js. were of the same opinion.

BISSELL, J. gave no opinion, having been of counsel in the cause.

Bill to be dismissed
without costs.